GUNDERSON, Appellant, vs. ROGERS and others, Respondents.

*March 24—April 13, 1915.*

*Wills: Mental capacity: Undue influence.*

1. Where a will is made in accordance with the dictates of natural justice it will require strong evidence of lack of mental capacity or undue influence to nullify it.
2. The evidence in this case is *held* to sustain findings of the circuit court that testatrix had mental capacity to make the will when it was executed, and that there was no undue influence.

APPEAL from a judgment of the circuit court for Crawford county: GEORGE CLEMENTSON, Circuit Judge. *Affirmed.*

Action to test the validity of an instrument purporting to

be the last will of Betsey R. Gunderson, deceased.    The trial court found as facts:

"(1) That Betsey R. Gunderson died on the 6th day of October, 1913, and was a resident at the time of her death of the county of Crawford in the state of Wisconsin.

"(2) That she left her surviving *Thomas B. Rogers, Elmer E. Rogers, Geneva Stunkard, Effie Salmon,* sons and daughters of said deceased; *Dove Stunkard,* a grandchild and daughter of Dora Stunkard, deceased; *Eston Salmon, Ruth Salmon, Sheldon Salmon,* and *Forest Salmon,* grandchildren and children of Pearl Salmon, deceased, daughter of Betsey R. Gunderson, deceased; and her husband, *Ole Gunderson.*

"(3) That the said *Ole Gunderson* was the third husband of the said Betsey R. Gunderson, deceased, and was married to the said Betsey R. Gunderson on the 23d day of February, 1898.    That the said *Ole Gunderson* was at that time thirty-five years of age, and that the said Betsey R. Gunderson was approximately fifty-seven years of age.    That the said *Ole Gunderson* at the time was, and for a period of about one year previous to his intermarriage with the said Betsey R. Gunderson had been, in the service of the said Betsey R. Gunderson as a farm hand.

"(4) That approximately all of the property of the deceased, Betsey R. Gunderson, had been accumulated by and was inherited from the former husband of the said Betsey R. Gunderson, namely, John Rogers, the father and grandfather of the legatees and devisees mentioned and named in said will.

"(5) That on the 28th day of February, 1913, the said Betsey R. Gunderson made and executed her last will and testament, which will was offered for probate; that the said will was executed in due form before E. Hoffland and Ada H. Garvey as attesting witnesses; that by the terms of said will all of the property of said Betsey R. Gunderson was bequeathed and devised in equal shares to her children and the representatives of her deceased children.

"(6) That at the time of the execution of said last will and testament the said Betsey R. Gunderson was of sound mind and disposing memory, and that the same was executed

by the said Betsey R. Gunderson of her own free will and without the exercise of undue influence upon her from any source."

Conclusions of law conformable to the sixth finding of fact were made, and from a judgment directing that the will be admitted to probate and reversing the order of the county court refusing probate thereof *Ole Gunderson,* the contestant, appealed.

For the appellant there was a brief by *Graves & Earll* and *A. B. Peterson,* attorneys, and *Bancroft & Johns,* of counsel, and oral argument by *J. L. Johns.*

For the respondents there was a brief by *W. F. & A. C. Wolfe* and *C. J. Smith* and an additional brief by *W. F. & A. C. Wolfe,* and the cause was argued orally by *W. F. Wolfe.*

VINJE, J.    From the foregoing statement of facts it appears that the testatrix married the contestant late in life when she had grown children by a former marriage, she being fifty-seven years old and contestant thirty-five when they were married; that she executed the will in question on the 28th day of February, 1913, and died on the 6th of the following October.

The evidence shows that the children of the testatrix were very much opposed to the marriage of their mother to contestant, and that such opposition was so radical that some of them did not visit her from the time of such marriage until shortly before she died.    It also shows that they were never on friendly terms with the contestant after he married their mother, but on the contrary took every opportunity to snub and even ill-treat him.    It is needless to inquire if there was any justification for such conduct.    It existed.    There is also some evidence that the children evinced a desire to inherit or receive by will the property of their mother, but no direct evidence of the exercise of any undue influence in that respect.

In July, 1905, the testatrix made a will which is still in existence, wherein she devised to the contestant the homestead forty on which they lived and also gave him one half of her personal property, the value of both being about $8,000. The real estate which passes under the last will was all received from a former husband of testatrix. The personal property was augmented to some extent by the proceeds of the farm upon which she and her husband lived from the time of their marriage till within a short time of her death. About nine months after her marriage to contestant she deeded eighty acres of land to him, one forty of which he subsequently reconveyed to her.

While there is considerable evidence showing that the children felt angry toward both their mother and the contestant, especially the latter, there is practically none showing that she had lost her maternal affection for them. But even if she had, it is a well known fact that parental affection lost or estranged for a considerable period during middle life is apt to reassert itself with advancing years or in the face of approaching death. She managed her own business affairs; she was a strong woman both physically and mentally and probably saw some justification for her children resenting her marriage to a hired man twenty-two years her junior. Be that as it may, the evidence fails to show any intent on her part at any time to disinherit them. In her last illness they all visited her, but owing to the ill feeling that existed between them and her husband she left the farm and went to an adjacent village to live with her husband, who on account of the conduct of the children during her sickness had been compelled to leave the farm and had secured a home in the village.

The will was made at the farm on the 28th day of February. Five days previous she had suffered a stroke of apoplexy which resulted in paralysis of the motor nerves of her left side. On the 28th she sent for Mr. Seegor Stevenson, a

merchant at Towerville, a mile away, to draw her will, also for Elmer Hoffland, a distant relative, to witness it. Miss Garvey, the nurse, was called as the second witness. When the scrivener came she told him she wanted him to draw her will. He asked her how she wanted it drawn. She told him in detail and he took memoranda. She correctly gave him the names of all her children and grandchildren and she suggested that the share of the children of one had better be held in trust, as she did not want their father to get hold of it. Then he went to the kitchen and drew the will. Upon returning he read the entire will to her and she said that it was just the way she wanted it. When she signed it she was propped up in bed and her hand was steadied, but she held the pen. After she signed it the witnesses duly affixed their signatures. None of the children were present when she talked to the scrivener or when the will was executed.

The testimony of the scrivener and the two attesting witnesses, supplemented as it is by that of several other wholly disinterested witnesses who saw testatrix after her stroke and before and soon after the will was executed, is so clear and convincing as to the existence of mental capacity on the part of the testatrix that it is not deemed necessary to give even a synopsis of it. Moreover, the evidence to the contrary is so vague and unsatisfactory that it can hardly be said to raise a conflict. In substance it is to the effect that she talked with difficulty; that she was weak, restless nights, worrying over her stroke, could not talk long at a time, and had, as the doctor put it, the hallucination of the fear of death— one by no means uncommon even among well persons of an advanced age. The evidence sustains the finding that the testatrix had the required mental capacity to make a will when it was executed.

Aside from the ill feeling and ill treatment which the children invariably manifested toward the contestant and the expressed natural desire to inherit from their mother the

property she had received from their father, there is no evidence of undue influence that really merits consideration. It can be said with reasonable certainty that testatrix was. not susceptible to undue influence on the part of her children or of any one else. She had for the past fifteen years been living apart from them, more or less estranged. She clung to her husband to the last as against the children. She had given him forty acres of land, and he had invested money derived from the proceeds of the farm in a corn sheller, threshing machine, and other farm machinery which he owned. No doubt she thought he had received enough.

Where a will is made in accordance with the dictates of natural justice it will require strong evidence of lack of mental capacity or undue influence to nullify it. The will of testatrix is a natural one, and the evidence both of lack of mental capacity and of undue influence is so weak and unsatisfactory that the trial court properly admitted it to probate.

*By the Court.*—Judgment affirmed.