ELLIOTT, Administratrix, Respondent, vs. FISK, Appellant.

*November 20, 1915—February 1, 1916.*

*Wills: Validity: Undue influence: Evidence: Sufficiency.*

1. To justify the setting aside of a will on the ground of undue in-
fluence there must be clear and satisfactory evidence establish-
ing the susceptibility of the testator to such influence, an oppor-
tunity for the exercise thereof, a disposition to exercise it, and a
result indicating its exercise; but the clear establishment of
three of these essential elements may with slight additional evi-
dence as to the fourth compel the inference of its existence, es-
pecially where the will is not a natural one such as relationship
usually dictates.

2. Thus, in this case, the finding of the trial court that a will executed
four hours before the testator's death, when he was in an ex-
tremely feeble condition, was the result of undue influence ex-
erted by the beneficiaries, who were not related to him and to
whom he gave all his property to the exclusion of an aged father
and other near relatives with whom he was on good terms, is
*held* not clearly erroneous, three of the elements above men-
tioned being pretty clearly established, although as to the dis-
position of the beneficiaries to exercise undue influence the proof
is meager.

APPEAL from a judgment of the circuit court for Monroe
county: E. C. HIGBEE, Circuit Judge. *Affirmed.*

Action to probate a will. July 25, 1913, John H. Elliott
died. Four hours previous to his death he executed a will
leaving $500 to *C. W. Fisk,* the proponent, and the remain-
der of his property, of the value of about $1,500, to one Jess
McCullough. Phillip Elliott, the father of the deceased,
contested the probate of the will on the ground of lack of
testamentary capacity on the part of the testator and undue
influence on the part of the legatees. The contestant has
died since this appeal was taken and the administratrix of
his estate has been substituted in his place. The county
court refused to probate the will because of lack of testa-
mentary capacity and the proponent appealed to the circuit

court. The latter found testamentary capacity, but refused probate on the ground of the exercise of undue influence on the part of the legatees. From a judgment entered accordingly the proponent appealed.

For the appellant there was a brief by *Naylor & McCaul,* attorneys, and *Graham & Graham,* of counsel, and oral argument by *W. B. Naylor.*

*John F. Doherty,* for the respondent.

The following opinion was filed December 7, 1915:

VINJE, J. The testator was a bachelor sixty-four years of age at the time of his death. His mother died in 1868 leaving a farm of the present value of about $15,000. His father married again and was living on the farm as tenant by the curtesy. He has died since this action began and an administratrix of his estate has been duly appointed and substituted in his place as contestant. The testator had a one-seventh interest in his mother's farm subject to his father's estate by the curtesy, and it appears that at various times he expressed dissatisfaction with his father and brothers because he could not obtain his share of his mother's estate. Otherwise he seems to have been on good terms with his relatives. Though of fair health up to within a few years of his death he never acquired any property of his own. His life was spent in various kinds of common work at different places. Part of the time he would work for his board only and part of the time visit with his relatives, including his father, his brother in Montana, and his sister in Nebraska. But he never stayed long with his father and had expressed dissatisfaction with his "hanging onto life" so long. He spent two winters doing chores for his board with a friend by the name of Hackett in Valley Junction, and he also stayed there five weeks in the spring of 1913. Some six or seven years before he died he made his home for a time with Jess McCullough,

the residuary legatee. For six months at least he paid him board. After that he came and went as he pleased. *Fisk,* the other legatee, was an old friend of his, but there is no evidence that he felt any more friendship for him or for McCullough than he felt for a number of other friends. For some time before his death he lived alone in a house near Valley Junction. A farmer by the name of Christenson was his nearest neighbor, and towards the end he and his family took care of him night and day. The Tuesday previous to his death, which occurred on Friday, he was taken from his house by McCullough on a cot and brought to the boarding house of *Fisk* at Tomah. He died from tuberculosis of the lungs, and for a week before he was removed to Tomah he was so weak and sick that he had been unable to take any nourishment except lemonade. His hands and feet were cold and showed discoloration, and he had to be turned in bed.

In May, 1913, he borrowed from a crippled brother $500, giving a mortgage on his share of his mother's estate as security. Of this money he had $325 left. The Saturday before he died he asked Christenson to take care of this money for him, but he refused. The next day he sent for Christenson, and when he came he asked him to make out a check for the money to McCullough, who was there. This Christenson did, dating the check as of Saturday, and the testator signed it. The next day McCullough drew the money from the bank and had *Fisk* draw an agreement to the effect that McCullough should make such arrangements and take such care of testator as he saw fit. McCullough took him to *Fisk's* house as stated and agreed to pay $20 per week for his board and nursing—Mrs. Fisk being a nurse.

From Tuesday until Friday at the time the will was executed the evidence is silent as to what took place. The testator, however, was continually growing weaker. When the will was being drawn his legs were rubbed to assist circula-

tion and to keep them warm.    The beneficiaries were present when the lawyer, called by *Fisk,* inquired of him how he wished to dispose of his property and they were present at all times thereafter till the will was executed.    He was then so weak that his hand had to be assisted in holding the pen and guided in making his mark, though he had been a fair penman during his life and had written a very friendly letter to his brother in May preceding when he obtained the $500. The will was read to him by the lawyer who drew it clause by clause and he assented to each.    Mrs. Fisk, the witnesses to the will, and the beneficiaries were then present.

Such, in brief, are the main facts touching the testator's life and condition immediately preceding the execution of the will as disclosed by the record.    The trial court found that the beneficiaries exerted undue influence upon him. Can we say that such a finding is clearly contrary to the legitimate inferences that may be drawn from the evidence?

It is quite clear that the testator was a man susceptible to undue influence, especially at the time the will was made, owing to his then extremely enfeebled condition.    There was what may be termed only a spark of life left in him.    He no longer had much vitality to assert a will of his own. Even in his usual health he must have been a man of rather feeble will power—lacking in initiative and push, for he never acquired any property of his own.    His motto seems to have been, Sufficient unto the day is enough.    In all these respects he differs from the testator in *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8, who had been an active business man and had evidently possessed a strong mind.    Neither was his will made in such an enfeebled condition, for he lived a month after it was executed.    So it must be deemed that the evidence establishes quite clearly and satisfactorily that the testator was susceptible to undue influence.    There is like proof that an opportunity to exercise undue influence existed, for

he was in the house of the proponent, *Fisk,* three days before
he died, when both *Fisk* and McCullough had access to and
visited with him.    On the question of their disposition to ex-
ercise undue influence, however, the proof is quite meager.
There is no direct evidence of it farther than that one of
them had received from him for safe-keeping and disburse-
ment all the cash that he had and the other was to receive $20
per week for caring for him.    Neither fact is very persuasive,
and both are consonant with disinterestedness and friendship
or legitimate business only.    Perhaps the strongest inference
that such disposition existed may be drawn from the fact that
they now seek to retain what was gratuitously given as against
an aged father who would otherwise have been entitled there-
to, and from the fact that the result appears to have been the
effect of such influence.    The deceased had never expressed
any intention of making a will, a fact of no great value be-
cause he considered he had little if anything to leave.    The
trial court was satisfied from the evidence that testator was
on good terms with his nearest relatives and that he enter-
tained no greater friendship for the legatees than he did for
his relatives and for a number of other friends, or felt him-
self under any greater obligations to them.    And such con-
clusion finds support in the evidence.    Hence the result in-
dicated pretty clearly the existence of undue influence.
While it is true that a testator susceptible to undue influence;
an opportunity for the exercise thereof; a disposition to exer-
cise it; and a result indicating its exercise must be established
by clear and satisfactory evidence before a court is justified
in setting aside a will, yet the clear establishment of three
of these essential elements may with slight additional evidence
as to the fourth compel the inference of its existence.    This
is especially true where the will is not what may be termed a
natural one, such as relationship usually dictates.    In *Gun-
derson v. Rogers,* 160 Wis. 468, 152 N. W. 157, it was said

that strong evidence of lack of testamentary capacity or of undue influence was required to nullify a will máde according to the dictates of natural justice. Where it is not so made less proof may suffice, for legitimate inferences of infirmity may be drawn from its departure from natural justice. Here at least some such departure occurs. In this respect also the case differs from the *Ball Case*. Here the property is left to entire strangers by blood or marriage; there it was left to the testator's second wife—his adult children by his former marriage having been to some extent previously assisted by him and having shared a $1,000 insurance policy, while the property left by the will to the wife did not exceed $3,000 in value.

The result reached is that, while the case is a close one, the judgment of the trial court must be affirmed because we cannot say it is clearly erroneous. As bearing upon the questions discussed recourse may be had to the following late cases in this court: *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8; *Duncan v. Metcalf,* 154 Wis. 39, 141 N. W. 1002; *Skrinsrud v. Schwenn,* 158 Wis. 142, 147 N. W. 370; and *Gunderson v. Rogers,* 160 Wis. 468, 152 N. W. 157.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied, with $25 costs, on February 1, 1916.