WILL OF EMERSON: WINTON, Appellant, vs. EMERSON and another, Respondents.

*March 12—April 8, 1924.*

*Wills: Testamentary capacity: Mental unsoundness: What constitutes: Opinions of witnesses: Weight: Attestation clause: Evidence: Sufficiency: Will in accord with previously declared purpose.*

1. Upon the whole record in this case it is *held* that there was no sufficient basis in the evidence (set forth in the opinion) for a finding that the testatrix, at the time of the making of her will, was incompetent, or that she was the subject of undue influence. p. 446.
2. The finding as to the incompetency is set aside, not primarily because the trial court misconceived the law, but because he gave undue weight to the opinions of two of the subscribing witnesses, which the witnesses said were based upon the fact that the testatrix had suffered convulsions before and after the making of the will, while positive and undisputed testimony in the case showed that testatrix was competent when it was made. p. 443.

3. Mere opinions of witnesses that mental unsoundness exists, unless based upon facts strongly tending to substantiate them, are entitled to but little weight.   p. 444.

4. It is common knowledge that physical infirmity and mental soundness may co-exist.   Mental weakness not due to mental disease but to physical infirmity does not constitute mental unsoundness.   p. 444.

5. Failure of the attestation clause of a will to contain any assertion of mental capacity or negation of undue influence does not suggest any infirmity in the will.   p. 445.

6. To warrant setting aside a will on the ground of lack of mental capacity or because of the presence of undue influence, the evidence establishing either must be clear, convincing, and satisfactory; and it is not enough that there is a mere preponderance of evidence in favor of the invalidity of the will.   p. 445.

7. Where the evidence of lack of mental capacity or the exercise of undue influence is unsatisfactory, the fact as to whether the will may be termed a natural one is of great significance, and evidence of a previously declared purpose consistent with the will is entitled to great weight.   p. 445.

APPEAL from an order of the county court of Milwaukee county: M. S. SHERIDAN, Judge.   *Reversed.*

June 20, 1922, Helen Emerson, deceased, executed her last will and testament disposing of an estate valued at approximately $8,500.   The testatrix had for thirty-five years been a teacher in the public schools of Milwaukee, had never married, and was about seventy-six years of age at the time of her death.   She left surviving her, one sister and nineteen nephews and nieces, among whom were Mrs. Harriette Whitnall and *Florence Winton*.   To each of these she bequeathed the sum of $3,000 and also made them residuary legatees in equal shares.   To the balance of her nieces and nephews she bequeathed sums ranging from $100 to $200 each.   She provided for a monument to cost not to exceed $400, and appointed her niece, *Florence Winton,* as executrix.   The will was in all respects properly executed and was witnessed by Hedwig Blaasch, Kathryn Mulligan, and T. H. Dorr, all of Milwaukee.   Due proceedings for the probate of the will were instituted, but the trial court denied

probate thereof on the ground of lack of testamentary ca-
pacity on the part of the testatrix and because of undue influ-
ence exerted over her by her niece, Mrs. Whitnall.    From
an order entered accordingly, the proponent, *Florence Win-
ton,* appealed.

For the appellant there was a brief by *Aarons & Tuteur*
of Milwaukee; and oral argument by *Charles L. Aarons.*

For the respondents the cause was submitted on the brief
of *Ernst von Briesen* of Milwaukee.

VINJE, C. J.    It appears from the evidence that in Jan-
uary, 1921, the testatrix was suffering from a slight cerebral
vascular lesion, and application was made by her niece, Mrs.
Elizabeth Jackson, to the county court for the appointment
of a guardian on the ground of mental incompetency to
transact her affairs.    The result of these proceedings was
that a special guardian was first appointed and later a gen-
eral guardian was appointed.    The testatrix did not appear
at any of these hearings.    The general guardian having re-
signed, a petition was filed asking for the appointment of
the First Wisconsin Trust Company as a guardian.    This
was in January, 1922.    While this application was pending
the testatrix conferred with her attorney, Thomas H. Dorr,
and the result was she requested that the guardianship be
discharged and that she be adjudged competent.  At a hear-
ing in which the testatrix appeared in court, and after having
been mentally examined by physicians, the court, on June
1, 1922, made an order terminating the guardianship and
declaring her competent to manage her own affairs.    Judge
SHERIDAN, before whom the guardianship hearing was had,
declared that the testatrix was a woman "fully able and
capable of managing her own affairs," and she impressed
him "as being a strong-minded and strong-willed person who
would not easily be influenced and would have positive and
decided opinions as to what she should do or not do."    In
November, 1921, the testatrix went to the Layton Home,

which is a hospital for people with incurable diseases, and there remained until July 8, 1922, when she went to live with her niece, Mrs. Whitnall, and there remained until her death, which occurred July 18, 1922.

It further appears by the evidence that on June 19, 1922, the testatrix executed a will, known as Exhibit B, which was signed and witnessed by her. It was written by Mrs. Whitnall, and afterwards, at her request, it was copied by one of the nurses or bookkeepers in the Layton Home. This will in its substance was essentially like the will presented for probate except that no executor was named and a slightly different bequest was made to one of the nephews. On the day her will was made she had a severe convulsion which terminated only a short time before Mr. Dorr, for whom she had sent, came to get directions for making a will. Exhibit B was used as the basis for the will to be drawn by Mr. Dorr, and he testified that each item was gone over and discussed by him and the testatrix. Mr. Dorr had long acted as attorney for the testatrix and had had many opportunities within three or four months of the time of the execution of her will to confer with her and judge of her mental competency. He testified that she was mentally sound, understood what she was doing, and directed what should be done. Upon his calling her attention to the fact that no executor was named in the will drawn by Mrs. Whitnall, and upon his suggesting a certain person as executor, she replied that such person had better not be appointed because he was not living in Milwaukee, and it would not be convenient for him to administer the will. Mr. Dorr then asked her, "Whom would you suggest?" To this she replied that *Florence (Winton)* had the settlement of her (mother's or father's) estate, that she had had experience, and that she would be willing to have her. Dorr then asked, "Do you want her to furnish a bond?" She asked, "How much will a bond cost?" Dorr told her something like $3 or $4 a thousand, and she said, "That is too much, I don't believe

that *Florence* ought to furnish a bond, I won't ask any bond." Dorr asked, "Shall I put that in the will?" and she said "Yes."

It appears further from the testimony that detailed conversations were had between Mr. Dorr and the testatrix as to a small change in one bequest, as to the amount that should be paid for a monument, and that when her attention was called to the fact that her will did not dispose of her entire estate, but left undisposed of about $1,200, and upon being asked how she wanted to dispose of the rest, she said, "I will give it to *Florence* and Harriette," meaning *Miss Winton* and Mrs. Whitnall. Dorr asked her in what proportion or share, and she answered, "Have it equal." Other conversations besides those already alluded to were testified to by Mr. Dorr as taking place between him and the testatrix before he drafted the will. He testified that in his opinion she was mentally competent to execute her will and appeared to be and was under no duress whatever. These conversations are set out somewhat in detail to show that, if they actually occurred as testified to, Miss Emerson was mentally competent to execute a will. The only testimony tending to show mental incompetency is the testimony of Mrs. Mulligan and Miss Blaasch, both of whom testified, after considerable questioning and pressure, that in their opinion Miss Emerson was not mentally competent to make a will at the time they signed it as witnesses. Both offer for their reason the fact that she was subject to convulsions. The testimony, however, shows clearly that she had no convulsion at the time she discussed the contents of her will with Mr. Dorr or at the time of its execution. On the contrary, the evidence shows that the convulsion she had before the will was executed terminated before Mr. Dorr came to see her, and that the convulsion she had after the will was executed was sometime after Mr. Dorr left and after the execution of the will. The will was read to her by Mr. Dorr before she signed it. Her signature to the will appears in

a firm, well-rounded hand, and indicates no physical weakness or disability except that it begins on a line of ruled paper and terminates slightly below the line; that is, a slight portion of some of the letters in the name "Emerson" appears below the line. This is accounted for on the ground that she had no glasses present at the time she signed. An offer was made to get her glasses, but she said that she thought she could make a good signature without them.

Miss Blaasch had not seen much of testatrix while at the hospital, but she appeared to be a very honest, straightforward, and impartial witness. She was reluctant to give her opinion as to mental competency, but upon being pressed said that in her opinion the testatrix was not competent. This opinion, as before stated, she based almost wholly upon the fact that testatrix had had a convulsion before the will was made. There is no direct medical testimony showing the precise kind or nature of these convulsions. They are described by one witness as consisting of a working of the facial muscles, a gripping of the hands, and a stretching out or straightening of the legs. It is within the field of lay knowledge to state that such convulsions, while mentally disabling the subject of them during the time they last, do not necessarily or generally produce any mental disturbance afterwards, nor incapacitate one from rationally disposing of one's property by will. Mental competency usually returns immediately upon the cessation of the muscular contractions of which the convulsions consist.

The testimony of Mrs. Mulligan is very unsatisfactory and very unreliable. She had been the testatrix's nurse only a short time before the will was executed, and it appears that in addition to her lack of opportunity for observing the testatrix she was possessed of a strong prejudice against Mrs. Whitnall as well as against the testatrix. She frequently contradicted herself upon the most important matters, and was utterly unable to remember or hold in her mind the sequence of the events concerning which she testi-

fied.   The combined efforts of the court and both counsel were unavailing to stop her flow of words or to prevent her from beginning to answer a question before it was half asked.   The trial court in his opinion stated that her testimony was very unsatisfactory but that she was an honest witness.   We are unable to agree with him in the last proposition.   Even from reading the printed page it is evident that she was strongly biased and determined to prove the utter mental incompetency of the testatrix, and therefore we give little or no weight to her testimony.

We fully sense the weight that the findings of the trial court carry upon questions of fact.   Nevertheless, we are constrained in this case to disregard such findings because they are not sustained by the evidence, and because they may have been reached by a misconception of the legal principles applicable to the denying of the probate of wills on the ground of lack of mental capacity or to the exercise of undue influence.   Our conclusion, however, that the findings of fact must be set aside in this case does not materially rest upon the fact that the trial judge misconceived the law, but upon the fact that he gave undue weight to the opinion of two of the subscribing witnesses which they themselves say was based upon the existence of convulsions.   The trial judge evidently overlooked or misconceived the fact that a person having convulsions such as were described in the instant case may nevertheless be perfectly competent to transact business in the intervals between the convulsions.   The testimony of Mr. Dorr and of Miss Hughes, who accompanied him on a visit to the decedent a few days before the will was executed, at which time business matters were discussed, conclusively shows that the testatrix was perfectly rational and mentally competent to transact business, and likewise the testimony of Mr. Dorr shows that she was perfectly rational at the time the contents of the will were discussed and at the time she signed it.   There is no direct contradiction of this positive testimony except the opinion

of the two witnesses to the will based upon the fact that the testatrix had convulsions. It is well settled, however, that mere opinions of witnesses that mental unsoundness exists, unless based upon facts strongly tending to substantiate them, are entitled to but little weight. *McMaster v. Scriven,* 85 Wis. 162, 55 N. W. 149; *Skrinsrud v. Schwenn,* 158 Wis. 142, 147 N. W. 370. It is also a matter of common knowledge that physical infirmity and mental soundness may coexist. The rule is thus stated in 28 Ruling Case Law, 95:

"Mere mental weakness not due to mental disease, but solely to physical infirmity, does not constitute mental unsoundness, and the courts will scrutinize efforts by witnesses to infer mental weakness or insanity from mere physical decrepitude."

So we have a case where mental capacity is directly testified to by Mr. Dorr and Miss Hughes and is only inferentially negatived by the opinions of Miss Blaasch and Mrs. Mulligan, based upon very weak if not wholly erroneous assumptions, namely, that the existence of convulsions before and after the making and execution of the will made the testatrix mentally unsound during the interval between the convulsions, when positive and undisputed testimony showed she was mentally competent to make a will.

Frequently throughout the trial the county judge adverted to the fact that in the attestation clause there was no assertion of mental capacity or negation of the exercise of undue influence. He adverts to that in his opinion as a significant fact and as evidence showing the lack of mental competency and the existence of undue influence. There is no evidence in the whole case tending to show that Mrs. Whitnall ever exercised undue influence over Miss Emerson. It is true she had the opportunity because she was frequently at the hospital and was in fact the person upon whom it devolved to look after her aunt, as she was near by and it was more convenient for her to look after her

wants than for any other of the nephews or nieces; but there is no evidence that she exercised or sought to exercise undue influence over her, and the testatrix seems to have been a woman not easily influenced.

The will contains the usual opening sentence: "I, Helen Emerson, of the city of Milwaukee, Wisconsin, being of sound and disposing mind and memory, do hereby make," etc. We are not aware that it is customary to include in the attestation clause any assertion of mental competence or the lack of undue influence. Therefore the absence of both conveys to our mind no suggestion of any infirmity in the will.

It is elementary that the right to make a will and to have it carried into effect is one of the most important and fundamental rights attaching to any individual. It is also elementary that in order to set aside a will, either on the ground of lack of mental capacity or the presence of undue influence, the evidence showing the lack of one and the exercise of the other must be clear and satisfactory. It cannot rest upon a mere preponderance of evidence in favor of the invalidity of the will. The proof must be clear, convincing, and satisfactory, and especially as to the exercise of undue influence, for this is a species of fraud and must be proven by clear and satisfactory evidence; and the rule is the same as to proof of lack of mental capacity. *Ball v. Boston,* 153 Wis. 27, 141 N. W. 8; *Will of Boardman,* 178 Wis. 517, 190 N. W. 355.

When the evidence as to lack of mental capacity or the exercise of undue influence is not clear and satisfactory, the fact as to whether the will may be termed a natural one is of great significance. *Gunderson v. Rogers,* 160 Wis. 468, 152 N. W. 157; *Elliott v. Fisk,* 162 Wis. 249, 155 N. W. 110. Here, upon all the evidence in the case, the will is such a one as relationship usually dictates. It is true that two of the nieces were given the bulk of the estate, but there is nothing strange or unnatural about that. Among

such a large number of nieces and nephews it is quite natural that a few should be considered the more favored ones. In this case the evidence shows that at least twenty years before the will was executed and from time to time thereafter the testatrix declared, as testified to by a number of disinterested witnesses, that *Florence* and Harriette were her favorite nieces and that they would be given the bulk of her estate upon her decease.   Evidence of such declared purpose is entitled to great weight in such a case as this. *Will of Blakely,* 48 Wis. 294, 300, 301, 4 N. W. 337.

Our conclusion reached upon the whole record is that there was no sufficient basis in the evidence for the finding that the testatrix was mentally incompetent to make a will or that she was the subject of undue influence.   As we view it, there is nothing in the evidence to contradict the testimony of Mr. Dorr as to what took place and as to the mental competency of the testatrix at the time the contents of the will were discussed between them or at the time it was signed.

*By the Court.*—Order reversed, and cause remanded with directions to admit the will to probate.