WILL OF WILLIAMS: DENTON and others, Appellants, vs.
LAKE and others, Respondents.

*January 16—February 10, 1925.*

*Wills: Testamentary capacity: Senile dementia: Testimony of attesting witnesses: Weight: Undue influence: Witnesses: Privileged communications: Physicians: Information not gained during professional treatment.*

1. Sec. 4075, Stats., prohibiting a physician from disclosing information acquired while attending a patient professionally, should be liberally construed to effect its purpose, but not so strictly as to exclude the opinion of the physician as to the mental condition of the patient, based on observation alone, during a given period, because the physician may have rendered services for that person at an earlier or later time. p. 168.

2. When attesting witnesses of good character give testimony as to testamentary capacity it should receive great consideration, but in a will contest it is not conclusive. p. 170.

3. When due and formal proofs are made of their execution, wills are not to be denied probate except upon clear and satisfactory evidence. p. 170.

4. A testatrix who executed her will during the last stages of senile dementia is *held,* under the evidence, not to have had testamentary capacity. p. 171.

5. Where, under the facts and circumstances, the court could find that there was a disposition to exercise undue influence on testatrix and that her will was the effect of it, his findings thereon, not being clearly erroneous, will be affirmed. p. 171.

ESCHWEILER and DOERFLER, JJ., dissent.

APPEAL from an order of the county court of Waukesha county: DAVID W. AGNEW, Judge. *Affirmed.*

For the appellants there was a brief by *Lockney, Lowry & Baird* of Waukesha, attorneys for *Mary Denton* and *Esther Clark,* and *A. G. Brendemuehl* of Oconomowoc, guardian *ad litem* for *Robert Lake,* and a separate brief by *Mr. Brendemuehl,* guardian *ad litem,* and oral argument by *Mr. Henry Lockney* and *Mr. Brendemuehl.*

For the respondents there was a brief by *N. W. Evans* of Oconomowoc, attorney for contestant *Florence Lake;*

*Lines, Spooner & Quarles* of Milwaukee, attorneys for contestant *Milwaukee Protestant Home for the Aged;* and *Ernest N. Warner* of Madison, attorney for *Woman's Board of Missions for the Interior,* and oral argument by *Mr. Evans.*

JONES, J. The testatrix, Mrs. Lavinia M. Williams, whose last will and testament is contested in this proceeding, was, in her younger days, a school teacher. At the age of forty-four she married a prosperous widower by the name of Daniel Williams, who had two children, now *Mrs. Mary Denton* and *Mrs. Esther Clark.* In 1903 Mrs. Williams received the sum of $9,141.59 from her father's estate, and on September 21, 1903, made a will leaving $3,000 to her niece, Edith Lake of Omaha, Nebraska, $500 to each of three children of Edith Lake, and certain other small legacies to various religious organizations, with the residue given to the nine parties benefiting under the will.

In 1914 the husband of the deceased died, and by the division of his property between the two daughters and the widow the testatrix received the sum of $5,000. After the death of her husband the testatrix lived at a boarding house of one Mrs. Leavit (now Mrs. Moore) until April, 1919, after which time she moved from place to place until in July, 1920, she went to the sanatarium of Dr. Ackley. On December 16, 1920, a petition signed by Frank Denton, the husband of the step-daughter of the testatrix, was filed in the county court, under which one J. F. Kettenhofen was appointed as guardian to look after the property of Mrs. Williams. In July, 1922, Mrs. Williams was removed from Dr. Ackley's sanatarium and taken to another sanatarium called Waldheim, where she remained until she died on March 26, 1923.

On July 19, 1922, while at Waldheim, Mrs. Williams made a will which is contested in this proceeding by some of the legatees under the former will made in 1903. By this

will made in 1922 the testatrix left $2,500 to each of her step-daughters, and the residue of her estate, which amounted to about $8,000, to be divided equally among the four children of her niece, Edith Lake, deceased, and provided that any legatee contesting the will would forfeit his or her legacy by such action.

Omitting some of the formal findings and matters stated above, the following are the findings of fact by the trial court: The court found that the testatrix in her early life and up to 1919 or thereabouts was a bright, smart person, neat and tidy in her person and in her housekeeping, and was an active church worker, given to reading church and religious literature, and did carry on an active correspondence with her relatives and friends; that Edith Lake, the mother of the surviving heirs of Lavinia M. Williams, deceased, was a daughter of the sister of the deceased and was orphaned when an infant, and thereafter was taken into the home of the testatrix and reared by her and her aged mother; that the most intimate and affectionate relation existed between the deceased and her and her children; that subsequent to the said settlement of her husband's estate testatrix expressed dissatisfaction with the settlement and stated "that the Williams" heirs would never receive anything from her; that after the death of her husband and until the latter part of 1917 the testatrix managed her own property and transacted, with assistance selected by her, her business affairs; that during the year 1918 she gradually relinquished the transaction of her business, and in 1919 had completely surrendered the management of her business affairs; that she kept no account of her income or disbursements and neither requested nor was presented with an itemized statement of her receipts and disbursements; that from early in 1917 she was suffering from senile dementia, evidenced by very poor memory and wandering trend of thought; that she continued to grow worse until 1919, when she became unable to carry on her usual correspondence, was

Will of Williams, 186 Wis. 160.

not able to read intelligently or understandingly letters received by her, suffered a complete loss of interest in social affairs, did not know familiar acquaintances, was unable to carry on an interesting or intelligent conversation, took no interest in church or religious affairs and evidenced no concern as to her spiritual welfare, and was unable to take care of her physical wants, did not realize her physical condition nor comprehend the necessity of looking after her health, doing many things evidencing a complete loss of mental understanding; that she gradually grew worse until early in the summer of 1922; that at the time and before the execution of the will she had no realization of the income of her estate, the cost of her maintenance, and did not comprehend that the disbursements were greatly in excess of her income; that she was unable to recognize her position and whereabouts in life, was moved from sanatarium to sanatarium without her consent or any realization upon her part where she was going; that for some time prior and on the 19th day of July, 1922, when the proposed will was executed, and thereafter and until the time of her death, she did not know or realize that her husband was dead, often referred to her father as living, did not realize that she was in a sanatarium, did not know those of old and intimate acquaintanceship, assumed no authority over her own personal physical actions and none over the management of her estate; that the mental disease from which she was suffering had so far advanced that there were no lucid intervals and that she was unable to comprehend any of the important affairs of life; that she did not direct or authorize the engaging of Mr. Derse to draft the will; that the services of Mr. Derse were selected by Mr. Kettenhofen after talking to Mr. Denton, the husband of the proponent of the will and one of the principal legatees, and all the arrangements for the making and execution of the will were attended to by Mr. Denton and Mr. Kettenhofen and who were alone with the testatrix during all the time that said will was drafted and executed;

that no effort was made to ascertain the mental condition of the testatrix by Mr. Derse, Mr. Kettenhofen, or Mr. Denton, no consultation was had with her physician or nurses, in fact no permission was asked of any one to enter said sanatarium; that at the time of the execution of said will sufficient opportunity was afforded to Frank Denton to exercise said influence and that the said Frank Denton and J. F. Kettenhofen showed a disposition to exercise it; that the result and terms of said will appear to be the effect of such influence.

As conclusions of law it was found that on July 19, 1922, the testatrix did not have sufficient mental capacity to know or comprehend the nature and extent of her estate and the natural objects of her bounty and to hold these facts in her mind sufficient time to form a rational thought or purpose; that the instrument was procured by undue influence being exercised upon her.

The testimony was very voluminous, and the record contains nearly 920 pages besides a large number of letters. It will be impracticable in this opinion to review the testimony in great detail or to more than outline the facts which show the physical and mental decline of Mrs. Williams from the period when she was mentally and physically alert and active to the date of the execution of the will. According to the undisputed testimony, between the years 1917 and 1919, from being neat as to her personal appearance and careful as to her clothing, she became careless and her memory became shorter. She paid less attention to her business affairs and formed the habit of cutting up her clothing and underwear. In February, 1919, she fell on the floor and could not get up, and after this her condition seemed materially worse. When a nurse was employed for her she did not seem to realize the fact. It was necessary to have bandages on her limbs, but she insisted on tearing them off. She wanted fires in the hot summer weather and burned some of her good clothing. In the fall of 1919 she

was unable at times to realize who some of the persons were with whom she was closely associated. Among these were her business agent and others living in the family with whom she boarded. During her stay with Mrs. Stone from October, 1919, until October, 1920, and just before Christmas, she broke her arm and after that failed rapidly. She would tear off bandages from her arm and insist that her arm was not broken. The testimony was that she hoarded articles of food and placed them in her bureau; that she would cut up her good underwear and it became necessary to remove garments from her room; that in October, 1920, she became a great care, lost control of her organs, would defecate in the bed and on the floor, was sometimes bound up in cloths, and in the night would get up and put the soiled cloths in a bureau and wash-stand drawer; that she used the water pitcher for her own personal use instead of going to the toilet and would afterward take the same pitcher and go and get a drink of water in the pitcher. On December 17, 1920, Mr. Kettenhofen, one of the witnesses to the will, was appointed guardian on the ground that she was incompetent to have the management of her own property. At the hearing he testified and said, among other things, that "she could not manage her estate. I would not think she could remember tomorrow if some one obligated themselves to her today." In October, 1920, Mrs. Williams was taken to Dr. Ackley's sanatarium, where she remained until March, 1922. After a fire in this sanatarium she was removed to Dr. Voje's Waldheim sanatarium, where she remained five or six weeks, and was then removed to the Ackley sanatarium and remained there until July 17, 1922, when she was again removed to Waldheim. A nurse at the Ackley sanatarium gave testimony to the effect that while there Mrs. Williams seemed intelligent, recognized her friends, and that there was very little inconvenience caused by her personal habits or lack of control of her organs. It seems difficult to reconcile this testimony with

that of numerous other witnesses on the same subject. While at these sanatariums Mrs. Williams' conversations with several witnesses showed that she believed that her husband and father were still alive; that she supposed her husband was out and would soon return; at other times that she was expecting letters from him or that he would come and take her to the theater. There was testimony that she did not know her own room, that she thought the sanatarium was a hotel; that when she was removed from place to place she was not consulted.

This testimony disclosing the mental and physical condition of Mrs. Williams at different times was given by ten lay witnesses for the contestants, who were apparently disinterested and intelligent. This testimony is corroborated by letters written by *Mrs. Denton,* one of the applicants principally interested, and one written by her husband. Some of these letters were offered by the proponents and others by the contestants. They are letters written to relatives, describing from time to time the condition of Mrs. Williams. Some parts of these letters indicated that at times she was intelligent and understood, but they present a sad picture of mental and physical deterioration. There are such passages as these:

"She always knows Frank, but at times looks so strangely at me I believe even I am slipping from her memory. It is indeed sad—awful." "About your letters—I doubt if she can read them at all any more—understandingly I mean— sometimes I guess she never opened the letters at all—and the plants and flowers you had sent her—she used them so ruthlessly it made my heart ache." "She can't walk without aid, but otherwise, as far as we could see, was the same as usual. Talked and laughed in her flat way—because her mind is about gone—I took her flowers—but she tore them to pieces before we left." "She seems very bright and like her old self at times, but the most of the time she is not right. It does not seem childish or losing her mind—but a

mild form of insanity. She does so many strange things—
and says such strange things—that I cannot write of now."

Most of the lay witnesses produced by the contestant ex-
pressed the opinion that Mrs. Williams was not of testa-
mentary capacity. We appreciate that such opinions may
not have great value, especially when the testator is affected
with such physical infirmities as may be given undue weight
by the unskilled. But the facts to which such witnesses tes-
tified from personal knowledge may be of great importance
in the final determination. The testimony of Bertha Nelson,
a witness called by the proponents, has been already referred
to. Dr. Henry Peters was also called by them. He had
known Mrs. Williams for many years. On several occasions
when she was at the Ackley home and also at Waldheim,
he met her and had casual conversation in which she seemed
to him normal and intelligent and he saw nothing to indicate
mental trouble. Medical witnesses were called by both par-
ties. Two physicians called by the proponents in answer to
long hypothetical questions stated that in their opinion Mrs.
Williams was of testamentary capacity. But on cross-ex-
amination, in answer to hypothetical questions stating some
of the facts proven and which were not included in the
former questions, they expressed their doubt on the subject.
They both gave it as their opinion that one in advanced
stages of senile dementia could not write a perfect signature,
and one of them testified that in senile dementia a person
would be competent to handle his property so long as he
could sign his name correctly and properly. It does not
appear that either of these witnesses had seen Mrs. Wil-
liams. The medical testimony chiefly relied upon by the
contestants was that of Dr. Voje of the Waldheim sana-
tarium, who had specialized in nervous and mental diseases
since 1888. His testimony was to the effect that on the date
of the will and for some time before she had senile dementia
in an advanced stage and was not competent to make a will.

He had treated Mrs. Williams years before, and after the execution of the will, while in his sanatarium. After the . fire at Dr. Ackley's and while she was at Waldheim in April and May, 1922, she was in the mental ward at Waldheim. She was Dr. Ackley's patient. During his absence Dr. Voje was responsible for the welfare of patients in case of emergencies but did not treat Mrs. Williams, as there was no emergency. A hypothetical question was asked in which he was told to disregard any information he obtained during any professional treatment and he answered as above stated. He testified that during April and May he frequently saw her and talked with her; that she would shake hands and smile but did not recognize him and did not know where she was.

It is earnestly claimed by counsel for the appellants that all this testimony of Dr. Voje was incompetent under sec. 4075, Stats. According to the testimony Dr. Voje rendered no professional services for Mrs. Williams while she was at Dr. Ackley's, in whose care she was. It is a matter of common knowledge that physicians are sometimes somewhat jealous of any interference with their treatment of their own patients by other doctors unless it is requested, and there seems no reason to doubt the testimony of Dr. Voje on this subject. He was asked to exclude any information he had gained while he had treated Mrs. Williams and to answer solely upon such knowledge as he had gained while not acting as her physician, and he stated that he could do so. Counsel for the appellants cite the following cases as bearing on this objection: *Renihan v. Dennin,* 103 N. Y. 573, 9 N. E. 320; *Green v. Nebagamain,* 113 Wis. 508, 89 N. W. 520; *Will of Hunt,* 122 Wis. 460, 100 N. W. 874. In our opinion these cases do not sustain the objection made. The statute should be liberally construed to effect its purpose, but not so strictly as to exclude the opinion of a physician as to the mental condition of a person, based upon observation alone, during a given period, because the physician may

have rendered professional service for that person at an earlier or later time. *Fisher v. Fisher,* 129 N. Y. 654, 29 N. E. 951; *Edington v. Ætna L. Ins. Co.* 77 N. Y. 564. The information on which Dr. Voje based his testimony was not gained while treating Mrs. Williams professionally and therefore the evidence was not prohibited by the statute. *Smits v. State,* 145 Wis. 601, 130 N. W. 525; *Boyle v. Robinson,* 129 Wis. 567, 109 N. W. 623.

Counsel for the appellants lay much stress on the claim that the will was a natural will because by its terms the property received by Mrs. Williams from her husband was to be returned to his heirs. Before executing the document she had expressed such an intention. She had also expressed a contrary purpose. She had stood in almost the relation of mother to Edith Lake, an orphan niece, and had sustained affectionate relations for many years with her children. There was no legal or moral obligation resting upon Mrs. Williams to give her step-children, who had received their share of their father's estate, her own property at the expense of those who were at least equally dear to her and were of her own blood. It is significant as bearing on this subject that during all the years while she was in the full possession of all her faculties she had seemed satisfied with the disposition of her property made by the former will.

The attesting witnesses testified in substance that Mrs. Williams personally gave directions in detail for the drafting of the will, naming the beneficiaries, was informed of the amount of her property, and was of testamentary capacity. It does not appear that the attorney who drew the will in her presence had been informed of her mental breakdown. Of course her guardian, the other witness, had such knowledge, although it does not appear that he was cognizant of the many details described by other witnesses. We fully agree with the appellants' counsel that when attesting witnesses of good character give such testimony as was given in this case it should receive great consideration. But

it would be a dangerous doctrine that in such a contest the testimony of the two attesting witnesses is conclusive. Their testimony is to be considered in connection with all the other evidence. We also agree that when due and formal proofs are made of their execution, wills are not to be denied probate except on clear and satisfactory evidence. For this, forgetfulness, old age, and infirmity are not enough. When the infirmities of old age have made one a burden to those he loves best, the ownership and power to dispose of property may be very precious and of vital importance in securing and holding the consideration and respect which may be well deserved. For this reason the courts deal rather kindly with wills of the aged, but not so favorably as to sustain them when testamentary capacity has ceased to exist.

We have a very unusual combination of facts. More than a year and a half before the execution of the proposed will Mrs. Williams was placed under guardianship as incompetent to have charge and management of her property. In a will contest, where the effect of such a proceeding was considered, this language was used by Mr. Justice WINSLOW:

"While the adjudication in the guardianship proceeding was in no sense *res adjudicata* in this case, it was doubtless considered by the trial court as quite persuasive in its effect, and rightly so, inasmuch as there was no claim that the mental condition of the deceased had improved between 1905 and August, 1907." *Deleglise v. Morrissey,* 142 Wis. 234, 125 N. W. 452.

In the instant case it clearly appears that the mental condition of Mrs. Williams grew worse after the adjudication. We have a case where a woman of more than ordinary intelligence and education, fond of reading and her church work, had ceased to concern herself in the subjects which had formerly absorbed her attention. She had formerly been active and efficient in attending to her business, but even before the guardianship had given up all control. Her

habits of neatness and care for her personal appearance had changed to those of greatest neglect and indifference, a change far more significant than if it were to occur in the life of one of the other sex. There was not only loss of memory and constant confusion of identity of persons and places, but her mind had become such a blank that she believed that her husband and father, long dead, were still living and that her husband was near her and ready to attend upon her wants. The only medical witness who had special experience in mental diseases testified that on the date of the execution of the proffered will Mrs. Williams was in the last stages of senile dementia. There is a very able argument in the appellants' brief by way of explanation of the mental condition of the deceased, and along the line that there was a lucid interval when the instrument was executed. The only witness who gave testimony on this subject was Dr. Voje, who testified that in advanced stages of senile dementia there are no lucid intervals. In discussing a case where senile dementia was claimed, it was said in the opinion of Mr. Justice BARNES, "The mind gradually loses its alertness and power of concentration until it is no longer capable of forming an intelligent judgment. When that period arrives, it is probable that there are no lucid intervals, although the person afflicted may be brighter at some periods than others." *Estate of Bean,* 159 Wis. 67, 149 N. W. 745.

On this mass of evidence, of which only an outline has been given, the trial court found that Mrs. Williams was not of testamentary capacity. On the subject of undue influence there was no direct testimony. Mrs. Williams was a person who was subject to undue influence. There was every opportunity to exercise it. There were facts and circumstances from which the court could find that there was a disposition to exercise it and that the result was the effect of it. We cannot say that the findings were clearly erro-

neous, hence the judgment is affirmed.    *Elliott v. Fisk,* 162 Wis. 249, 155 N. W. 110.

*By the Court.*—Order affirmed, and the guardian *ad litem* and the contestants to be allowed taxable costs in this court out of the estate.

ESCHWEILER, J. (*dissenting*).    The sole question was, Did Mrs. Williams on July 19, 1922, know who by relationship to her or her deceased husband were the natural objects of her bounty, appreciate what property she had, keep such facts sufficiently long in her mind to form a rational judgment concerning them, and rationally declare what she wanted done with her property after death?    If so, no matter how sick, infirm in body or mind she might be, or whatever delusions she may have labored under on other subjects, she was in law competent to make a will. *Butler's Will,* 110 Wis. 70, 78, 85 N. W. 678.

There is the clear, uncontradicted, and unimpeached testimony of Mr. Derse, the attorney at law who drafted the will, that she fully and completely measured up to this test. It was from Mrs. Williams that he learned the names of the several beneficiaries, their residences, and the amounts to be given to each in the eminently fair, natural, and just disposition that she made by her will of the $15,000 she then had.

To her own blood relatives she left about what she had received from her own father in 1903, as she had then done by the first will.    She gives to the two children of her deceased husband $5,000, which was the amount she had received from him on his death in 1914.

Grant that at times she fancied that her husband and her father were still alive, yet such or any other delusions were not manifest at the time she dictated her will and certainly played no part in the disposition she then made.    Stress is laid upon the many instances of forgetfulness on her part

Will of Williams, 186 Wis. 160.  Dissent.

of things in the near, and a dwelling upon incidents of the remote past. Such, however, accompany old age itself and are not of themselves *indicia* of senile dementia.

There is in the record uncontradicted medical testimony that one in the last stages of senile dementia, the condition found to exist by the trial court, cannot write. Her signatures to the documents of 1903 and of 1922, with many other examples of her handwriting, are in the record. Though between the two wills is the interval of nineteen years; the breaking of her arm, after which she did but little writing; and the physical weakness inevitable with old age, yet the later signature is a demonstration that when she signed the document written by Mr. Derse she could not have been the driveling imbecile contestants claim she was.

*Will of Emerson,* 183 Wis. 437, 198 N. W. 441, presents a parallel case, and I think the result there reached of sustaining the will should have been the result here.

Without further comment, but feeling so strongly that the clear and convincing evidence as to her mental capacity to execute a will at the time that she did sign the document proposed for probate ought not to have been discarded and her just and natural desire thwarted to render unto her own blood that which she had received from her father, and unto the blood of her husband that which she had received from him, I must register my dissent.

I am authorized to state that Mr. Justice DOERFLER joins in this dissent.