Estate of Bickner: Schwoch and others, Proponents, Appellants, vs. Bickner, Contestant, Respondent.

*September 11—October 9, 1951.*

For the appellants there were briefs by *Thiel & Allan* of Mayville, and oral argument by *Lloyd Allan* and *John A. Thiel.*

*George A. Hartman* and *Leo C. Hartman* of Juneau, for the respondent.

FRITZ, C. J.    The testator, Edward J. Bickner, died on December 4, 1949, at the age of eighty-two, survived, as his only heirs, by two nephews, Franklin Bickner, a bachelor, and Arthur Bickner, married.    Testator was a bachelor and spent most of his life on a farm with his two sisters, Henrietta and Lucy, up to the times of their deaths in 1944 and 1946, respectively.    He and the sisters owned the farm.    After the death of Henrietta, in January, 1944, the testator executed a will drawn in June, 1944, at the office of Attorney James T. Healy, in which he devised a ten-acre wood lot to a neighbor, and devised a store building in Beaver Dam to his nephew, Arthur C. Bickner, subject to a life estate in the sister, Lucy, and upon her death, the building and residue of his property was to go to said nephew.    In 1947 he executed a second will in which he bequeathed to a church and three hospitals, in specified amounts, a total of $3,500; $1,000 to his nephew, Franklin Bickner; and devised his eighty-acre farm to Lester Schwoch, a neighboring farmer and friend; and devised and bequeathed to his nephew, Arthur C. Bickner, a house in Beaver Dam and the residue of the testator's estate.    On August 23, 1949, the testator executed his last will in which he bequeathed to three hospitals, two churches, and an educational academy, in equal shares, all moneys which he had (about $17,500) in bank savings accounts when he died; devised to his nephew, Arthur C.

Bickner, a house in Beaver Dam worth an estimated $8,000 to $10,000; and devised and bequeathed to "his friend and neighbor," Lester Schwoch, "all of the residue of his estate" which included testator's eighty-acre farm, worth approximately $14,000, a ten-acre wood lot, a small quantity of farm produce, and $1,818.42 on deposit in testator's checking accounts in banks.

There was proof on the trial that from the time of the testator's sister Lucy's death in 1946 to the date of his death, the testator lived alone on the farm without any housekeeper, and that from November to April, he lived in the kitchen of his home seldom leaving the house. His necessities of life were provided through his own and largely Lester Schwoch's efforts. He was a man of strong convictions and extreme likes and dislikes, and very "positive," "determined," "strong-willed," and hard to get along with. The testator was self-reliant and could and did provide for himself and handled his financial affairs with intelligence. He sold a Beaver Dam store building in 1948 for $20,000, which he deposited in two Beaver Dam banks; the income not needed by him for his current bills he deposited in the banks, and he indorsed his own checks and made his own bank deposits. The rental income from his Beaver Dam property he used mainly to finance his living expenses; there was no squandering of his estate and he left no debts. There was no evidence that he failed to appreciate the full extent of his estate, and at the time his third will was drawn, he told the attorney the exact amount and extent thereof.

For many years testator rented the farm on shares; and in October, 1946, he rented it to Lester Schwoch on a fifty-fifty basis, and this arrangement continued to the time of his death. Schwoch testified that they had previously agreed that if he took care of Bickner, he would be fully compensated for his services by testator leaving the farm to him, and that this kindly feeling of the testator toward Schwoch continued

to the date of testator's death, except for a brief interval during the spring of 1949.

Schwoch testified the testator had no use for his nephew, Franklin Bickner. His nephew, Arthur C. Bickner, was a salesman, residing in Watertown, and with his wife he visited testator and his sisters at the farm until Christmas, 1947, and Arthur and his wife testified she served some meals at testator's home and cleaned the house in 1944, and that they never had any difficulties or quarrels with testator until after his sister's death in 1946. When Arthur was in the Beaver Dam area on business, he would visit testator and take fruit to him, and drive him to Beaver Dam and help him with his personal affairs and write checks for him, until August or September of 1949. Testator accepted the fruit graciously and never offered payment and was never asked for compensation.

Arthur and his wife testified also that prior to testator's sister Lucy's death in 1946, she gave her nephew Arthur and his wife, Alice, a couple of figurines and a couple of small rugs; and that the testator gave them a moth-and-mouse eaten rug which they had offered to buy from him; and that he helped put the gifts in the nephew's car. Arthur's wife took the things from the testator's house, but she claimed they were gifts; and she and her husband testified they never received anything from testator and never took anything from the farm after Lucy's death. Schwoch testified the testator disliked Arthur's wife and based his dislike on the conviction that she had stolen some personal belongings from his home; and that a few days later testator told Schwoch he was watching through a crack in the barn door when some boxes were loaded by Arthur and his wife into their car. Schwoch testified he was likewise an eyewitness to the fact that the boxes were loaded into the car; and that testator in August, 1948, told his nephew Arthur that his wife should not come to the

farm any more. Arthur visited testator at his farm three or four times until September, 1949.

On January 5, 1949, a deed executed by the testator for the ten-acre wood lot and a bill of sale to the farm personal property were given to Lester Schwoch. He testified that this was done at the insistence of the testator, and that they went to James T. Healy's law office to have the deed and bill of sale prepared, but he was away on his vacation, and an attorney, James Malone, was requested to prepare the deed and bill of sale. The deed was signed by the testator and witnessed by his attorney, James Malone, and by Dr. Clarke, testator's physician, and then delivered and placed on record. On Mr. Healy's return, he discovered the execution of the instruments and informed the testator that he had deeded away his property; that this was contrary to the understanding between Lester Schwoch and the testator, for it had been agreed between them that the property would remain that of the testator until his death,—although no specific reservation as such was inserted in the instrument. After his conference with Mr. Healy, the testator became alarmed at the consequences of his act, and accused Schwoch of being a crook and informed Mr. Healy that he should get his property back; and he denied that he had ever signed such papers. On being informed of the testator's desire to have the property returned to him, Schwoch agreed and a bill of sale and a deed returning the property was prepared by Mr. Healy and signed by Schwoch and his wife on April 30, 1949. When Schwoch was accused by the testator of wrongfully obtaining his property, he stayed away from Bickner's home until in a matter of days he sent word that he wanted Schwoch to come back. Thereafter there was no further difficulty between the testator and Schwoch. But there was testimony that during said interval, the testator made ill-considered remarks saying that papers were hidden

on his farm by which Schwoch would obtain his farm; and that during the winter of 1948–49, the testator mentioned hearing voices coming over the air and especially that of the nephew Arthur's wife to the effect that she was going to pay the taxes and obtain his farm. Dr. Clarke testified that this condition of the testator was only temporary, and in a matter of ten days his mind was free from any such disturbance.

There was testimony by Attorney Healy that in the latter part of May, 1949, he and Mr. Keller, a neighbor and friend of the testator, at his request, took the will which the testator executed in 1947 to the farm and that testator said that he wanted to get the farm out of his will, and he tore the will and burned it in the stove. Testator referred to Lester Schwoch as a "damn crook."

In June, 1949, Mr. Keller brought testator to Mr. Healy's office, and the testator said he was going to give the farm to Schwoch; he insisted repeatedly he wanted a paper drafted by which he could give the farm to Schwoch; and stated that nothing was to be left to his nephew, Franklin Bickner, because he had a guardian, and not a "damn cent" to his nephew, Arthur Bickner, because his wife was trying to get all of testator's property; and the testator told about hearing Arthur's wife's voice come over the wires over his house and that Schwoch told him he heard the same thing down at his house. In the latter part of July, 1949, Attorney Healy and Mr. Keller went to see testator, who complained that he was not well, his head bothered him and he could not walk, but that he did not want a doctor. He again said that he did not want his nephew, Franklin, around, nor Arthur, nor Arthur's wife, because she was trying to get all his property. A week or ten days later, testator presented himself at Mr. Healy's office and said that he came in because

Schwoch wanted the farm. Mr. Healy did not draft a deed because he felt testator was not competent.

On August 23, 1949, Schwoch took testator to the law office of Lueck, Skupniewitz & Lueck. There Schwoch gave the scrivener an old piece of paper on which the names of five institutions were scribbled and crudely written. On the trial he testified he prepared that memorandum. The parties named thereon were the five institutions to which the testator bequeathed all moneys in his savings accounts in banks. The will in question was then drafted and executed.

At the conclusion of the trial the court found that:

(1) The testator was not unduly influenced at the time of the execution of the will;

(2) The testator was sane and had testamentary capacity at the time of the execution of the will, except only as to possessing delusions;

(3) The testator was obsessed by insane delusions that his nephew Arthur and his wife were stealing and illegally taking away some of his property; that such delusions originated in his mind as early as 1946, and they increased with the passing of time; that they were a continuing type of delusions and that they persisted at the time of the execution of the will; that they substantially affected his judgment in the disposition of his property under the will at bar.

Thereupon the court concluded that the instrument propounded for probate by Lester Schwoch *et al.,* as the last will of Edward J. Bickner, should not be admitted to probate; and entered judgment denying probate of the instrument executed on August 23, 1949, as the last will of Edward J. Bickner.

Upon our review of the record it is apparent, as stated in the court's findings of fact, that at the time of the testator's execution of the will of August 23, 1949, he (a) was not unduly influenced and (b) was sane and (c) had testamentary capacity. But the finding that he was sane and had testamentary capacity was qualified by the court adding. "except only as to possessing delusions." And in

the third finding of fact the court states, "that testator was obsessed by insane delusions that his nephew Arthur and his wife were stealing and illegally taking some of his property."

Appellants contend that because in this case it was proven that testator observed Arthur Bickner and his wife take several boxes containing figurines and rugs from his house and put them in their car and take them away and thought that they were stealing those articles, there cannot be sustained the court's finding that at the time of testator's execution of his will on August 23, 1949, there were such insane delusions on the part of the testator that his mind and judgment in the disposition of his property were so substantially affected that he was incompetent to dispose of his property under the will. Although Arthur and his wife claim the articles in the boxes which they placed in their car were gifts, there was no proof that when the testator saw them put them in their car and take them away that they were not being stolen. As under these circumstances there was some basis for his belief that they were being stolen, his conclusion, however erroneous or unjust, was not an insane delusion.

As stated in 68 C. J., Wills, p. 433, sec. 30:

". . . A mere mistaken belief or an erroneous or unjust conclusion is not an insane delusion if there is some foundation in fact or some basis on which the mental operation of the testator may rest, even though the basis may be regarded by others as wholly insufficient. Similarly, even though the testator may be in error in his reasoning, undue or unnatural prejudice or aversion, if based on any kind of reasoning, is not an insane delusion."

"If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though on a consideration of the facts themselves his belief may seem illogical and foundationless to the court; for a will, it is obvious, is not to be overturned merely because the testator has

not reasoned correctly." 1 Underhill, Law of Wills, p. 126, sec. 94.

To the same effect see: 1 Page, Wills (3d ed.), p. 295, sec. 144; 1 Schouler, Wills, Executors and Administrators (6th ed.), p. 151, sec. 130; Thompson, Wills (3d ed.), p. 112, sec. 64.

It is undisputed that on the occasion in question, some articles in cartons were removed from testator's house and placed by his nephew Arthur and his wife in their automobile, and that the testator saw and resented it and concluded that the nephew and his wife were stealing some of his property.

As the testator saw the nephew and his wife carry things from his home and pack them into their car, it would not necessarily follow, even if he were wholly in error as to their right to take the things, that he was the victim of an insane delusion. It could still be a rational conclusion of the testator based upon what he observed, and any sane person might have drawn the same conclusion under similar circumstances. The testator may have been mistaken in his belief, he may have been severe in his judgment, but it would not follow that he was the victim of an insane delusion.

"In order to be an insane delusion the mistake must be one which is not based upon evidence; or at least without any evidence from which a sane man could draw the conclusion which forms the delusion. It is not merely a bias or prejudice. The justice or injustice of the will does not determine whether it is or is not the result of an insane delusion." 1 Page, Wills (3d ed.), p. 295, sec. 144.

To bar the will of a testator requires proof, and the burden of proof rests with the contestant to show by clear, convincing, and satisfactory evidence that the mind of the testator was deranged. The legal presumption is in favor of sanity and sufficient legal capacity to make a valid will, and the burden of showing such insanity or incapacity is upon the contestants. *Will of Emerson,* 183 Wis. 437, 198 N. W. 441; *Estate of Scherrer,* 242 Wis. 211, 7 N. W. (2d) 848; *Will*

*of Szperka,* 254 Wis. 153, 158, 35 N. W. (2d) 209, 35 N. W. (2d) 911.

There was ample proof that the testator in the month of August, 1949, was wholly competent to take care of all his property and business affairs intelligently, and there is no evidence that during that month the testator was the subject of any undue influence or restraint, or the victim of. any mental obsession.

Moreover the fact that by paragraph three ,of the will of August 23, 1949, the testator devised to his nephew, Arthur Bickner, the house and lot in Beaver Dam, stated to be valued at $8,000 to $10,000, which is a substantial part of the testator's estate, shows that he intended to duly favor his nephew, Arthur Bickner, to that extent.

*By the Court.*—Judgment reversed and cause remanded with directions to admit to probate the will executed on August 23, 1949.