WILL OF FORTNER: FORTNER, Appellant, vs. HELGESON and others, Respondents.

*December 9, 1925—January 12, 1926.*

*Wills: Testamentary capacity: Undue influence: Degree of proof: Evidence: Sufficiency: Appeal: Review of findings: Failure to file exceptions.*

1. Under ch. 286 of the Laws of 1925, amending sec. 2869, Stats. 1923, the supreme court will review findings of fact made in the court below without exceptions thereto being filed. p. 599.
2. In proceedings to probate a will, the testator being seventy-five years of age at the time the will was executed, and who devised his property to his insane wife for life and the resid-

uary estate to his three sons, with smaller gifts to other children and to grandchildren, the evidence is *held* not to sustain a finding of testamentary incapacity or that the will was the result of undue influence. p. 608.

3. Proof of mental incapacity, or that testator's will was the result of undue influence, must be clear and satisfactory to defeat the will. p. 612.

APPEAL from a judgment of the county court of Vernon county: D. O. MAHONEY, Judge. *Reversed, with directions.*

This is a proceeding instituted to probate the will of Henry Fortner, deceased. The probate of the will was opposed on the grounds (1) that said instrument was not the last will of the deceased; (2) that deceased, at the time of making the will, was not of sound mind but was mentally incompetent; and (3) that the testator was subject to undue influence and the instrument was procured by fraud. The proposed will was executed on the 15th of May, 1919. The decedent died on the 31st day of August, 1924, aged nearly eighty years. The proposed will is as follows:

"I, Henry Fortner, of the town of Sterling, do hereby make and declare this my last will and testament as follows:

"1. I hereby give and bequeath to my beloved wife, Margaret, the use of my entire property and estate while she lives.

"2. Except as stated in paragraph No. 1, I dispose of my property and estate as follows: I give, devise, and bequeath unto my beloved son, *Adolph,* one span of horses, two cows, and all farming tools and farm implements, including tackle for team, also the following real estate, namely:

"The east half of northeast quarter, the north half of northeast quarter, and the northwest quarter of the northeast quarter, section 35, and a piece of land 12 rods north and south by 40 rods east and west in the southeast quarter, section 26, township 12, range 6.

"3. I hereby give and devise to my beloved son, Anton, the west half of southwest quarter, section 25, and the

south half of southeast quarter, section 26, township 12, range 6, excepting a piece of land 12 rods north and south by 40 rods east and west out of southeast corner thereof.

"4. I hereby give and devise unto my beloved son, Elmer, the southwest quarter of northwest quarter, section 25, the southeast quarter of the northeast quarter and the northeast quarter of the southeast quarter, section 26, township 12, range 6.

"5. I give and bequeath unto my beloved daughter, *Johanna Helgeson,* the sum of $1,000.

"6. I hereby give and bequeath unto my beloved grandchildren, *Arene Stroble, Roger Olson,* and *Verna Olson,* each the sum of $200.

"7. I hereby give, devise, and bequeath all the rest, residue, and remain— my estate unto my beloved sons, *Adolph,* Anton, and Elmer, share and share alike.

"I make no bequest to the children of deceased son Albert, as I have already helped them sufficiently to make their just share of my estate.

"8. I hereby nominate, constitute, and appoint my beloved son, *Adolph,* executor of this my last will and testament.

"In witness whereof I have hereunto set my hand and seal on this 15th day of May, 1919.

"HENRY FORTNER.    (Seal)

"The above instrument was on the day of its date signed, sealed, published, and declared by the testator to be his last will and testament in the presence of us who have signed our names as witnesses thereto at his request, in his presence and in the presence of each other, and at the time of such signing the testator was of sound disposing mind and memory and free from any restraint or undue influence.

"H. P. PROCTOR, Viroqua, Wis.
"A. T. FORTUN, Viroqua, Wis."

Hearing was had before the county court on December 12 and 13, 1924, whereupon the county court made its findings of fact and conclusions of law as follows:

*"Findings of fact.*

"1. That Henry Fortner, a resident of said county, died at said county in the month of August, 1924, aged eighty

years, leaving surviving him the following named persons as his sole heirs at law, to wit: *Johanna Helgeson,* daughter; Anton Fortner, son; *Irene Strobel,* a daughter of Tena Strobel, a deceased daughter of deceased; Margaret Fortun, a daughter of Elmer Fortun, a deceased son of deceased; *Roger Olson* and *Verna Olson,* children of Aleda Olson, a deceased daughter of deceased; *Adolph Fortner,* a son; Henry Fortner, *Arthur Fortner, Minnie Thompson, Esther Zitzner, Alice Rodden, Hazel Fortner* and *Hilda Spellum,* children of Albert Fortner, a deceased son of the deceased.

"2. That at the time of the death of said Henry Fortner, deceased, he owned and possessed real estate of the value of $40,000 or more and personalty of the value of $10,000 or more.

"3. That about twelve years prior to the date of the death of the deceased he sustained an injury to his head and spine which rendered him unconscious, and thereafter until his death continued to be in failing health, with lessened and increasing mental and physical vigor until his death.

"4. That for many years prior to his death the deceased was addicted to the excessive use of intoxicating liquors, frequently becoming intoxicated.

"5. That for many years prior to the date of the death of deceased, the deceased lived practically alone with his two sons, *Adolf* and Anton, who supplied him with intoxicating liquor—the three frequently becoming intoxicated together.

"6. That for several years prior to the making of the claimed will on the 15th day of May, 1919, the two sons named in finding No. 5 had charge of the business of the deceased.

"7. That for months before the 15th day of May, 1919, and on said day, the deceased was highly susceptible to undue influence, and especially susceptible to undue influence on the part of said two sons, *Adolf* and Anton, and that on the 15th day of May, 1919, the said two sons, *Adolf* and Anton, had great and controlling influence over deceased.

"8. That the deceased was at all times on friendly terms with his children and grandchildren, his daughter, *Johanna· Helgeson,* having taken care of his insane wife for some two years prior to the death of deceased and having re-

mained at home the greater part of six years after her majority, without compensation, and by her efforts largely assisting in accumulating the property of the deceased—said daughter, *Johanna Helgeson,* being the oldest child of deceased.

"9. That the contestants were proper objects of the testator's bounty. That the distribution of the proposed will in giving to the son *Adolf* about $23,000 worth of property, to Anton about $14,000 worth of property, and to Elmer—who died before the date of the testator's death—about $13,000 worth of property, and largely disinheriting the other heirs, makes an unjust distribution of testator's property.

"10. That on the 15th day of May, 1919, at the time of making the proposed will, Henry Fortner did not have testamentary capacity.

"11. That on the 15th day of May, 1919, at the time of making the proposed will, Henry Fortner was mentally incompetent to make a will.

"12. That on the 15th day of May, 1919, at the time of making the proposed will, Henry Fortner was subject to the undue and improper influence of his sons, *Adolf Fortner* and Anton Fortner.

"13. That the instrument proposed is the product of undue and improper influence exercised by *Adolf Fortner* and Anton Fortner upon the mind of their father, the deceased.

"14. That on the 15th day of May, 1919, Henry Fortner, deceased, was a person unquestionably susceptible to undue influence on the part of his sons, *Adolf* and Anton, both of whom theretofore and then had a sufficient opportunity to exercise it, and that the proposed will is the result of such undue influence.

"And as *Conclusion of law.*

"1. That the instrument proposed for probate as the last will and testament of Henry Fortner, deceased, is not entitled to probate, and that the contestants are entitled to judgment denying the probate thereof.

"Let judgment be entered accordingly."

Judgment was entered accordingly, from which judgment the petitioner appeals.

For the appellant there was a brief by *Proctor & Proctor* of Viroqua, and oral argument by *H. P. Proctor.*

*C. J. Smith* and *J. Henry Bennett,* both of Viroqua, for the respondents.

CROWNHART, J. The respondents contend that this court should not review the evidence in the case for the reason that the appellant failed to file any exception to the findings of fact in the court below. This court has so held many times, but since these decisions ch. 286, Laws of 1925, was passed, amending sec. 2869, now sec. 270.39, Stats. 1925, the essential part of which reads as follows:

"It shall not be necessary to except to errors in the charge to the jury or to the findings of fact and conclusions of law made by·the court or to the judge's refusal to charge the jury as requested, but the same shall be reviewed by the appellate court without exception; provided, that no finding of fact and conclusions of law or, charge to the jury shall be subject to review which was expressly requested by the party seeking the review."

This section is construed as providing for review in this case without exceptions being filed.

The general principles of law applicable to the consideration of the will in this case have been very definitely expressed by this court. The test as to mental capacity to make a will was considered in *Butler's Will,* 110 Wis. 70, 85 N. W. 678, where it is said:

"The test is not whether the testator did the best or the wisest or the theoretically just thing in his will; but, Did he have sufficient active memory to collect in his mind and comprehend, without prompting, the condition of his property, his relations to his children and other persons who might properly be his beneficiaries, and the scope and bearing of his will, and to hold these things in his mind a sufficient length of time to perceive their obvious relations to each other, and be able to form some rational judgment in relation to them?"

More recently, in *Will of Emerson,* 183 Wis. 437, 198 N. W. 441, it is said:

"It is elementary that the right to make a will and to have it carried into effect is one of the most important and fundamental rights attaching to any individual. It is also elementary that in order to set aside a will, either on the ground of lack of mental capacity or the presence of undue influence, the evidence showing the lack of one and the exercise of the other must be clear and satisfactory. It cannot rest upon a mere preponderance of evidence in favor of the invalidity of the will. The proof must be clear, convincing, and satisfactory, and especially as to the exercise of undue influence, for this is a species of fraud and must be proven by clear and satisfactory evidence; and the rule is the same as to proof of lack of mental capacity."

With reference to the subject of undue influence, in *Will of Lotwin,* 186 Wis. 42, 202 N. W. 151, this court, the Chief Justice writing the opinion, said:

"The vital question in every will contest where undue influence is claimed to have been exercised is, Was the will such a one as the testator wanted to make? His reasons for so making it may be good or bad, or there may be no reasons whatsoever for the making of it. If it is clearly apparent that it was in fact his will, it is immaterial what reasons he had for the making of the will in the manner in which it is made. He is entitled to have his will carried out according to its directions."

Having these principles in mind, we now come to a consideration of the facts. It appears that Henry Fortner was a Norwegian farmer living in Vernon county for many years. He was married and had ten sons and daughters and numerous grandchildren. At the time of his death he left surviving him one daughter, *Johanna,* aged fifty-five, a son, Anton, aged forty-three, and another son, *Adolph,* aged twenty-eight. Seven sons and daughters had died preceding the death of the testator. The wife of the testator was insane for several years before her death, and died prior

to the death of the testator but after the making of the will in question.   The testator owned at the time of his death a farm of 480 acres, of the value of about $40,000, and owned personal property, consisting of money and certificates of deposit in the bank, of about $9,000.   The two sons, Anton and *Adolph*, lived with the testator on his farm during their whole lifetime, up to the date of testator's death.   One son, Elmer, provided for in the will, died after the making of the will and preceding testator's death.   The testator's daughter, *Johanna,* lived with testator on the farm for some time after she became of age, during the busy season, and worked out part of the time.   She did not testify at the trial.

The testator was given to drink and was sometimes intoxicated.   During the latter years of his life he bought beer and brought it home, and the two sons joined him in drinking and sometimes became intoxicated.   About eight years before making his will the testator fell from a wagon and injured himself, resulting in a stiff neck and a shuffling gait, which remained with him until his death.   On the 15th of May, 1919, he went with his son *Adolph* to Viroqua. He there met his son-in-law, Chris. Helgeson, to whom he said that he wanted to visit the law office of Proctor & Proctor, and inquired the location of the office.   Helgeson took him as far as the office and the testator went in.   There he met the senior member of the firm, H. P. Proctor, and wanted his will drawn.   Proctor had drawn a prior will for him, which testator wished to have changed.   He told Proctor the disposition that he wished made of his property, and the attorney drew his will accordingly.   The will was drawn in duplicate.   The assistant cashier of a bank, A. T. Fortun, was called in by Mr. Proctor to witness the will. He was acquainted with the testator, passed the time of day with him, and then signed the will in duplicate as a witness.   Proctor also signed in duplicate as a witness.   The

testator took one of the duplicates with him and gave the other to the attorney to keep. · This latter copy is the one that was proposed for probate. The testator took his duplicate to his home, where it was afterwards seen by a daughter-in-law. Later he put the will with his certificates of deposit in the lock-box in the bank in Viroqua where he did business, and there it was found during the trial. The two wills were exact duplicates in all respects, each being duly executed, signed, and witnessed. Some few days after the making of the will testator met his son-in-law, Helgeson, and told him that he fixed up his will at Proctor's office, and that it was all right. After the making of the will testator lived something over four years, keeping a duplicate of the will, without any change, in his private possession. He frequently went to the bank to have his certificates of deposit renewed during the first three years after the making of the will, and the certificates of deposit and the will were kept in the same lock-box. The testator on several occasions exhibited a somewhat violent temper, but these cases were rare. Testator, prior to the making of the will and for some three years thereafter, did more or less business in the way of selling the produce from the farm and in looking after his money in the banks. He did some work on the farm. He was quite deaf, making conversation ·with him difficult, but he talked ·intelligently with neighbors on occasion during these times.

The contestants of the will produced as witnesses C. O. Helgeson, son-in-law; J. E. Strobel, son-in-law; Harold Helgeson, grandson; *Henry Fortner*, grandson; Mrs. Albert Fortner, daughter-in-law; *Minnie Thompson*, granddaughter; and *Arthur Fortner*, grandson, each of whom would profit if the will were disallowed. The evidence of these witnesses, with the exception of C. O. Helgeson, was practically all to the same effect. The witnesses recited the injuries to the testator, his deafness, his habits of life,

his occasional outbursts of passion, and wound up by testifying that they thought he was not competent to make a will in May, 1919.

C. O. Helgeson, the husband of *Johanna,* one of the respondents herein, testified in substance the same as the other witnesses, but in addition he testified that on the day the will was drawn he met the testator in Viroqua and took him to the office of Proctor & Proctor. He did not go into the office with the testator. He said:

"I saw him in Viroqua about the time this will was made. I was putting up my team in the stone barn, and he came out as I was putting up the team and went back with me. He had a bottle of whisky with him in his pocket, and he was intoxicated.

"After I had put the team up, he said he had to go to Proctor's office, and asked if I knew where it was, and I said, 'I am going that way, and if you will wait a minute I will show you where it is.' And I left him at the outer door going into Proctor's office. He was then quite .intoxicated, very much so, and was intoxicated to the extent that, in my judgment, he would be utterly incapable to do any important business. I remained in town for one hour and a half before I saw him again. When I saw him again he was standing at the Hotel Fortney corner, and he was badly intoxicated. I led him to the stone barn and told him to stay there until he got ready to go home. I saw him a few days afterwards, and asked him what his business was at Proctor's office that day, and he said he had fixed his will. That he had fixed his will over. I told him he should not have fixed any will on that day, and he said that was all right, he had everything fixed. He said he had a list with him that *Adolph* had made out. I observed all these years his ability to carry on a conversation. He would talk about one thing and then switch onto another.

"I heard his conversation with *Adolph* as to the making of his will, at two different times. *Adolph* was not satisfied with the will that was made, or the will the old man was going to make before the first will was made, and he was telling him how he should make his will. Some of the

children was dead, and he did not like to have them get what the old man intended to give them. I heard him talk about changing the will already made, three years ago last February. *Adolph* said that the child of the deceased son, Elmer, was getting too much; that it was outrageous. The old man did not say much."

When Helgeson inquired of the testator as to his business with Proctor, it is not claimed the testator was drunk, and he then said he had fixed over his will and that it was all right. Other witnesses produced by the contestants, not financially interested in the outcome, were:

(1) John F. Erickson, who had lived within five or eight miles of the testator in his lifetime and knew him well, and frequently had conversations with him. He said testator's health was good before the accident, and afterwards it was somewhat impaired, mentally and physically. It was his opinion that in May, 1919, testator was unable to transact any business. He had not seen testator in May, but had seen him the winter previous. He had seen him twice a year in the last ten years.

(2) Lars Lothen, who had known testator for twenty years and had seen him once in a while during that time. He found it difficult to talk to the testator after the accident on account of his hearing. He related an occasion when he visited testator and said to him, "Howdy do?" to which testator replied, "Who are you?" Then testator remembered him. He related some peculiar conduct of the testator on this occasion,—the putting of a dipper of water on the fire in a stove without apparent reason. He met testator in Viroqua afterwards, and thought he was in failing health, but he had not come in contact with the testator much during the last seven or eight years of his life. He had not seen him more than once a year during that time. The witness testified:

"*Q*. At all of these times since the accident some ten or twelve years ago, did you consider from the fact that Mr.

Fortner had a stiff neck and walked with a shuffling gait that he was incompetent to transact business? *A*. No, I did not.

"*Q*. Would you have been willing to transact business with him during the last five or six years? *A*. Depends on what the business would be.

"*Q*. Would you buy a horse or sell a cow, or any business? *A*. I think small deals I would, but he told me himself he could not carry on his business like he used to."

(3) Hans Johnson, who lived in Viroqua and had known the testator for thirty-eight years. After witness moved from the farm to Viroqua, thirteen years before, he did not see testator until four or five years ago. He then noticed that he had undergone a big change. He noticed his walk, his neck, and that he looked altogether different than when he left the farm. He was different in his actions, in his talking, and in his mind. He was very short of head, and did not talk like he used to. From his observation and acquaintance with the testator during thirty-eight years prior to his death, and the conversations that he had with him from time to time and the changed expression and actions that overcame the man after his injury, and the way he acted when he met him in the street about six years previous, in his opinion testator would not be competent or capable of making a will in May, 1919. He did not think testator was capable of doing any important business in May, 1919, though he might do some small business. When he met him he talked to testator awhile. Testator said, "We are getting old, we are soon to leave here, I and more of us."

(4) Chris. O. Hium, seventy years of age. Noticed a change in the testator about ten years ago, after he was hurt. Noticed his stiff neck and could not get much conversation out of him. His eyes did not look as clear, and he walked slowly. He did not see testator on an average of over once a year. About eight years ago he was at

his place and testator's conversation was different. It was his opinion that in May, 1919, testator's mind was not as sound as it had been. He could give no definite answer as to testator's ability to transact business in May, 1919, as he wasn't there, but his judgment would be that he could not. He saw the testator last about eight years ago. He was there probably half a day. That was the longest time that he had seen him. "*Q.* You are willing to testify that there was no time during those eight years that he was competent to transact his own business? *A.* Yes." But he said testator was a man who did not squander his money. "In the last eight years I don't know whether he looked after his business or not, but he told me in conversation at that time that the boys did the business."

A Dr. Trowbridge, basing his judgment on a hypothetical question submitted by counsel for respondents, testified that he diagnosed testator's case as one of chronic insanity. The question submitted, however, somewhat exaggerated the facts as claimed by contestants, and represented only respondents' contention as to the facts.

This summary does not give the evidence in detail. Space will not permit this. It gives a fair sample of the evidence produced in opposition to the probate of the will.

On the other hand, the attorney who drew the will testified that testator appeared to be sober when he came into the office; that he appeared to be perfectly competent and capable of making a will, and that testator gave him the instructions from which to draw the will. Reference to the will shows that it required intelligence and judgment to give the necessary instructions for drawing it. The will on its face is not unnatural. In the first paragraph he bequeaths the use of his entire property to his wife, who was then insane, so long as she should live. That was a natural and a proper thing to do. Secondly, he gave to his son *Adolph,* who was the younger son and who lived with him

on the farm, one span of horses, two cows, all farming tools and farm implements, including tackle for team, and a farm, properly described. He gave to the older son, who lived with him on the farm, a portion of real estate, correctly described, and he gave to a third son a portion of real estate, correctly described. The proportions in value are about $23,000 to *Adolph*, $14,000 to Anton, and $13,000 to Elmer. Elmer did not live on the farm, and died before the testator died. Testator also gave to his daughter, then fifty-one and married, $1,000. This was the daughter who had remained at home part of the time for a few years after she became of age. It does not appear from the evidence that she was in need or that she was not comfortably circumstanced. Testator gave to three grandchildren $200 each.. He then devised all the rest of his property to his three sons, share and share alike. He then set forth that he made no bequest to the children of the deceased son, Albert, as he had already helped them sufficiently to make their just share of his estate. Reference to the testimony will show that the testator had given Albert, when he was married, a farm of sixty acres, a team and a wagon, and had given him money from time to time. This bears out the statement in the will that Albert had been helped sufficiently in his lifetime. This will does not appear to be the will of a drunken man or a man incompetent to make a will, and certainly not the will of an insane man. It is said to be an unnatural will because the daughter did not receive a just proportion of the property. We cannot say from the evidence that the daughter did not receive a just proportion. All the facts and circumstances are not before us and were not before the county court. The daughter had been married for many years. She may have been well taken care of. Her future might have been assured. These things may well have been entitled to consideration in the mind of the testator. We cannot close our eyes to

the fact that it is quite a common practice for men, especially of European birth, to give the greater part of their property to the sons, particularly where the daughters are married. But whether or not the will is just or unjust is a matter of little importance in considering whether or not the testator had mental capacity to make a will. The will bears evidence on its face of the mental capacity of the testator.

It is said that the will was the result of undue influence on the part of *Adolph*. There is nothing in the evidence to support this claim except the opportunity on the part of *Adolph* to exercise this influence. It is true that *Adolph* receives the larger share of the property. There may well have been reasons in the testator's mind why this should be so. As to this the evidence is silent. But if it be a fact that *Adolph* exercised undue influence, it would be strange that Elmer, the son who was away, should receive so large a share of the property. Again, it would be strange, if *Adolph* wished to exercise this influence, that he did not go with his father to the lawyer's office and be present at the drawing of the will. We think there is no evidence to justify a conclusion of undue influence. It is true that there is some evidence that *Adolph* said to his father that the former will gave too large a share to Elmer, but this was something he had a right to think and to say, and it does not appear that testator was influenced thereby. Testator left Elmer a goodly proportion of his property, notwithstanding *Adolph's* suggestion. The son-in-law, Helgeson, testified that after the will was made he heard *Adolph* trying to get testator to change the will. Testator did not say much, but it is significant that *Adolph's* entreaties were of no avail,—testator did not yield—he did not change the will.

On the part of the proponents of the will, A. T. Fortun, assistant cashier of the First National Bank of Viroqua, testified that he had known the testator during his lifetime;

had seen him once a day for the last ten or twelve years; had talked with him at different times about his business; that he thought testator was competent and qualified to transact business, especially his own business, during the last six or seven years, except the last year.   Tom Yttri testified that he had known testator fifty-four years; that he last saw him in February, 1922; that he talked to him then and his mind was all right; that prior to that time he saw him about every other day; that five or six years ago testator was in his store and bought some timothy seed; that he always took testator to be a sound-minded man—a good business man.   Archie Fish testified that he had known testator for six or seven years, and had seen him once or twice a week during that time, and had talked with him quite a bit.   He had bought feed from him and he was all right—a shrewd business man.   He had bought hay and grain from him, and testator was all right when Fish saw him.   Eda Fortner, widow of testator's son Elmer, testified that she went to the testator's farm in March, 1917, and stayed for several years, with the exception of six months spent in North Dakota and a short time in Denver.   She saw testator at her home in Denver in 1918.   She thought he could transact all his business when he was there.   She thought he was competent.   She next saw him in 1920. She visited him at the farm and stayed about two weeks. Testator was the same as he had always been.   He was looking after his own affairs.   Witness went to keep house for the testator in February, 1922, and stayed until April; then she went to Denver and came back July 3, 1922, and has remained at the testator's farm ever since.   As to the testator's drinking, she testified: "It would be hard to say exactly, but not very often.   About every five or six weeks he would go to De Soto and bring his beer home.   He came home alone and brought his team."   She first knew that the testator was failing about a year before he died.   He then

became nervous and gradually got worse. Testator had some certificates of deposit, which he kept in a box in the house under lock and key. He would get the certificates and look them over, and see when the interest became due, and would send them with the boys to be renewed. Testator had shown her his duplicate copy of the will sometime in February or April, 1922. The witness would profit by a probate of the will. A. T. Fortun, assistant cashier of the First National Bank of Viroqua, was a subscribing witness to the will. He did not notice anything out of the ordinary with the testator at that time. He had seen him two or three times a year before that. Testator came into his bank to get his certificates renewed, and he would talk both English and Norwegian with the testator. At the time of making the will he was natural,—just the same as he had always been. Testator was in the bank in June, 1923, and got a certificate of deposit renewed. Witness had never seen testator drunk, never smelled any liquor on his breath. E. P. Kuehn, assistant cashier of the Bank of Viroqua, knew testator in his lifetime, probably for the last five years. Testator frequently called at the bank to have certificates of deposit renewed, probably four or five times a year. "Q. During the times that Henry Fortner was transacting business with you, you may state what your opinion was as to whether he was competent to transact business? A. I think he was."

The evidence of the incapacity of the testator to make a will is of the weakest kind. In sum and substance, it is the opinion of the witnesses, not specially qualified to judge, based upon observation. Most of the witnesses who gave this opinion were interested in the outcome, but the facts upon which the witnesses based their opinions do not justify the conclusion that the testator was incompetent. Drinking to excess is a vice, but is not proof of incapacity to do business while the party is sober. One may have a stiff neck

and walk with a shuffling gait, but that is not evidence of mental incapacity. One may have occasional outbursts of passion, but that is not proof of incapacity to do business. All these things together are very slight evidence of incapacity to dispose of property. On the other hand, the fact is this old gentleman did do business and do it intelligently during these very times about which the witnesses testified. He accumulated property and preserved it well. That is shown without contradiction. He had drawn a will in which he disposed of his property in a perfectly intelligent manner. The witnesses to the will, who were disinterested, testified as to his competency. The assistant cashiers of two banks testified to meeting him frequently and doing business with him, and that the testator handled his own money and his own affairs with the banks in a proper and intelligent manner. His neighbors, who were closely associated with him and who were disinterested, testified to having actual transactions with the testator during the latter years of his life, and that he was intelligent and competent to transact business.

·To sum up: The testator was a prosperous Norwegian farmer, who lived to a ripe old age, conserving his property to the end. His general health seems to have been good till within one year before his death. He was intelligent and read newspapers in both the English and Norwegian languages. He had some idiosyncracies of character quite unimportant as bearing on his competency to make a will. He made a will which was not unnatural and which was plain and intelligible. He kept a duplicate of his will within his reach and observation for about four years after its execution. During that time he frequently did business at two banks in an intelligent manner. He expressed satisfaction with the will shortly after it was made, when he was sober and competent. He provided liberally for his son Elmer, notwithstanding the complaint of his son *Adolph,* who it is

claimed used .undue influence over the testator.  Testator appears to have been a sturdy farmer with a mind of his own, notwithstanding all the foibles of many years of his life, which have been brought in review to disparage his old age.by those who did little for him during that time, but who desire to profit by a disallowance of his will.

It is very plain to this court that the contestants failed to show, by that clear and satisfactory evidence required under the rules of law, that the testator was mentally incompetent to make a will at the time when the will was drawn, or that the will was the result of undue influence. Hence the judgment must be reversed.

*By the Court.*—The judgment of the county court is reversed, with directions to admit the will to probate.