WILL OF HEGNER: SAGER, Executor, Appellant, vs. HEG-
NER and others, Respondents.

*April 4—April 30, 1929.*

For the appellant there was a brief by *Ryan, Cary & Ryan* of Appleton, and oral argument by *Thomas H. Ryan.*

For the respondents the cause was submitted on the brief of *Albert H. Krugmeier* and *Joseph Witmer,* both of Appleton.

CROWNHART, J. The will offered for probate was contested on the ground that the deceased testatrix was incompetent to make a will. The deceased was an unmarried woman, about forty-five years of age at her death. In November, preceding her death in January, 1928, she made the will in question. She was ill with tuberculosis abnoma of the stomach, and at that time was not expected to live long. She called in her pastor, Reverend Sauer of the Evangelical Lutheran St. Paul's Congregation, Appleton, and expressed her desire that he draw her will. He declined to draw the will, but at her request he procured his son, a banker, and a Mr. Sigman, a lawyer, to go to testatrix's house that evening to attend to the matter. The will was drawn by Mr. Sigman according to the testatrix's instructions. No one was present except Mr. Sigman, Mr. Sauer,

Jr., and the testatrix. The testatrix, who was in bed, requested Mr. Sigman to draw the will, and produced from under her pillow a memorandum containing the names of her proposed beneficiaries. The beneficiaries were friends and relatives, and it is a perfectly natural will except that she did not remember in her will her brothers and sisters. From the testimony it appears that she had had some trouble with them, or at least they were not on visiting terms.

The testatrix was sick over a year, and suffered at times a great deal of pain. At such times she was given opiates to deaden the pain.

When the will was offered for probate, Mr. Sigman and Mr. Sauer, Jr., who both signed as witnesses, testified to the facts at the time the will was drawn. They testified that the testator appeared sane, understood fully what she was doing, and that she answered all questions in a responsive way. Both testified that she was of sound mind and memory. Reverend Sauer, her pastor, testified to the conversations he had with her the same day, and to the fact that she seemed perfectly normal in her mind and memory. Another pastor of the church, Reverend Brandt, testified to his acquaintance with her and that she attended his church. He saw her occasionally during her illness, and always found her sane and competent. A neighbor, Mrs. Pansky, who saw testatrix a few times during her illness, testified that she was of the opinion that testatrix was insane, particularly on one occasion she testified to some facts from which she drew that conclusion. She said testatrix looked terrible—talked funny—she looked as though she were insane. Notwithstanding this testimony, the witness sent her little thirteen-year-old girl over to stay alone with the testatrix the same night. The little girl testified that when she went to stay with her, testatrix put her in a bed alone; that after she had gone to bed the testatrix came to her and said that the pillows on the bed were the same on which her

mother died, and for her not to be afraid. "If you feel anything hovering around you during the night, don't be afraid because it is only the spirit of my mother." The little girl became frightened and asked to go home, and was permitted to do so. She testified that she used to get milk for testatrix, and testatrix would leave the money in a pail on the porch for her regularly; that when she came that night she noticed nothing unusual about testatrix.

Dr. Hegner was a witness. He testified that, assuming the facts in a very long and involved hypothetical question were correct, he thought she could not comprehend perfectly the condition and extent of her property, her relation to the persons who were, or should have been, or might have been, the objects of her bounty, and the scope and bearing of the provisions of her will.

The doctor treated her from July 13, 1927, to January 17, 1928, when she died. He testified that she appeared normal. The doctor based his judgment on the duration of the disease, and that in all diseases of that kind a secondary anemia develops and in time it affects the mentality of the patient. On cross-examination he was asked:

"Q. Assuming the facts to be true as stated in the hypothetical question, would you say that the patient's mind was diseased? A. No, sir; her mind wasn't, not primarily.

"Q. Was the patient insane? A. No, sir.

"Q. Was her mind unsound? A. No, sir; I wouldn't say it was unsound.

"Q. Did the patient have lucid intervals? A. Some.

"Q. Isn't it usual that a person suffering from the disease this person in the hypothetical question suffered from, is mentally sound up until about the time of death? The mind is all right? A. Yes, the mind is all right as far as the brain condition is concerned.

"Q. Isn't it a fact that there is nothing in this hypothetical question which would indicate that this was an unusual case of a person suffering from that disease? A. No. . . . Opiates are administered when the pain is severe and it tends to destroy the mind of the patient temporarily.

"*Q.* Would that account for certain hallucinations and delusions? *A.* It may.

"*Q.* After the medicine had worked off and the opiate had done the work and the effects had worn off, would there be lucid intervals? *A.* There would.

"*Q.* Assuming the facts of the hypothetical question to be true, you have already testified that there was nothing wrong with the patient's brain? *A.* No.

"*Q.* That the only infirmity was due to the disease from which she was suffering? *A.* Yes.

"*Q.* In other words, there was no melancholia or mania or delusions? *A.* There was no evidence of insanity of any sort."

There is other evidence on both sides that was merely cumulative.

It appears quite clearly that this woman was competent to make a will at the time she made it; that she knew what she wanted to do with her property, and did it. The will was a natural will for her to make. She said she wanted to remember her friends who had helped her, and she did.

It does not appear with certainty whether she had any other property except the homestead in which she lived, and the furniture, including the piano. The homestead was worth about $5,000. She devised this homestead to the church of which she was a member, on condition that $200 a year for ten years be used for the education of a needy student of the ministry, and that the home be used as a parsonage for the church. So it is evident that if there should not be found other property than that disclosed at the hearing, there would not be enough property to carry out her desires as expressed in the residuary clause in her will. Evidently the testatrix overestimated the value of her estate, a very common experience among those fully competent to make a will.

Proof of mental incapacity to make a will must be clear, convincing, and satisfactory. *Will of Boardman,* 178 Wis. 517, 190 N. W. 355; *Will of Emerson,* 183 Wis. 437, 198

N. W. 441; *Will of Fortner,* 188 Wis. 594, 206 N. W. 969. The evidence of mental incapacity of the testatrix does not meet the test of the law. On the contrary, we think it affirmatively appears from the evidence that she was fully competent to make her will.

We conclude that the will should have been admitted to probate.

*By the Court.*—The order of the county court is reversed, with directions to allow the will.